554 A.2d 404

ST. PAUL FIRE AND MARINE INSURANCE COMPANY

v.

Homer C. HOUSE et al.

No. 186, Sept. Term, 1987.

Court of Appeals of Maryland.

March 9, 1989.

Robert P. Schlenger (Frederick J. Green, Jr., Donald B. Davis, Jr., Lord & Whip, P.A., all on brief), Baltimore, amicus curiae for Nat. Union Fire Ins. Co. of Pittsburgh, Pa.

Paul D. Krause, Michael E. Myckowiak, Jayson L. Spiegel, Jordan, Coyne, Savits & Lopata, all on brief, Rockville, amicus curiae for Medical Mut. Liability Ins. Society of Maryland.

David M. Funk, Terrance W. Tankard, Shapiro and Olander, Baltimore, Stephen P. Carney, Hunt Valley, all on brief, for petitioner.

Alan N. Gamse, E. Suzan Miller, Semmes, Bowen & Semmes, Baltimore, all on brief, amicus curiae for American Ins. Assn.

J. Joseph Curran, Jr., Atty. Gen. and Meg L. Rosthal, Asst. Atty. Gen., Baltimore, both on brief, amicus curiae for Ins. Com'r of the State of Md.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

Maryland Code (1957, 1986 Repl. Vol.), Art. 48A, § 482 provides in pertinent part:

"Where any insurer seeks to disclaim coverage on any policy of liability insurance issued by it, on the ground that the insured ... has breached the policy by failing to cooperate with the insurer or by not giving requisite notice to the insurer, such disclaimer shall be effective only if the insurer establishes, by a preponderance of affirmative evidence that such lack of cooperation or notice has resulted in actual prejudice to the insurer."

We granted certiorari in this case to determine whether § 482 applies when an insurer asserts that there is no coverage under a "claims made" liability policy because the claim was not made while the policy was in effect. That issue is not presented on the facts of this case, however, because that issue arises only if the policy here involved is construed as the insurer contends. As explained below, we do not accept the policy construction on which the insurer's argument is premised.

Respondents, Homer C. House, M.D. and his professional corporation (Dr. House), had a series of annual policies (the policy) with Petitioner, St. Paul Fire and Marine Insurance Company (St. Paul) beginning January 1, 1983, the last of which ended on January 1, 1986. The policy had a retroactive date of January 1, 1977. It was a physicians and surgeons professional liability policy and was written in a "claims made" form. It provided in part:

"When is a claim made?

"A claim is made on the date you first report an incident or injury to us or our agent."

On October 29, 1984, Dr. House performed surgery on Shirley J. Platzer (Platzer) and allegedly left part of a needle in her knee. The object was removed on November 27, 1984. Subsequently, Dr. House received two letters from counsel for Platzer, dated June 21, 1985, and September 16, 1985. The letters stated a claim against Dr. House for damages and advised him to turn the matter over to his insurance carrier.

On November 15, 1985, Platzer initiated proceedings against Dr. House before the Health Claims Arbitration Office. A statement of claim was served on Dr. House on January 6, 1986, and was forwarded by him in a letter dated February 12, 1986, to his insurance broker. That broker was an agent for St. Paul.

St. Paul declined to defend Dr. House, asserting that it did not receive notice of the claim at any time before February 14, 1986, when the agent received Dr. House's letter. That notice, St. Paul maintained, was not received within the policy period and the claim was, therefore, not a covered risk.[1]

On July 1, 1986, Dr. House filed a declaratory judgment action in the Circuit Court for Baltimore City, claiming that Art. 48A, § 482 required that St. Paul prove actual prejudice before it could deny coverage for lack of notice. Both parties moved for summary judgment. The court concluded that, as a matter of law, § 482 was applicable and granted summary judgment to Dr. House.

St. Paul appealed to the Court of Special Appeals, arguing that § 482 was inapplicable to denials of claims made coverage. The intermediate appellate court recognized "the persuasiveness of [St. Paul's] argument to the contrary and

---

1. For that reason St. Paul takes the position in its brief that "[f]or the purpose of this appeal, it is not material whether St. Paul received notice of the Platzer claim on February 12, 1986, or on a later date...."

the cases in support thereof," but finding the unqualified language of § 482 to be "dispositive," it affirmed the judgment. *St. Paul Fire & Marine Ins. Co. v. House,* 73 Md.App. 118, 132, 533 A.2d 301, 308 (1987). We granted certiorari.[2]

Section 482 was originally enacted by Ch. 185 of the Acts of 1964, in apparent response to our decision in *Watson v. United States Fidelity & Guar. Co.,* 231 Md. 266, 189 A.2d 625 (1963).[3] *Watson* was an insurer's action against the insured seeking a declaratory judgment that an occurrence coverage, automobile liability policy did not apply to claims arising out of a particular accident. Reporting the accident to the insurer, as soon as practicable, was an express condition precedent to any action on the policy. *Watson* held that the condition was not satisfied because the insured, who was present at the accident of March 5, 1961, did not report to the insurer until April 10, 1961. The response of § 482, in substance, makes policy provisions requiring notice to, and cooperation with, the insurer covenants and not conditions. The statute measures by the standard of actual prejudice the materiality of any breach of those covenants by the insured for the purpose of determining if the breach excuses performance by the insurer.

St. Paul's argument rests on the difference between claims made policies and occurrence policies. In *Mutual Fire, Marine & Inland Ins. Co. v. Vollmer,* 306 Md. 243, 252, 508 A.2d 130, 134 (1986), we contrasted the two types of policies.

" 'Generally speaking, "occurrence" policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Converse-

---

2. St. Paul does not contend before us that, if § 482 applies, there is a genuine issue of material fact whether the insurer has been actually prejudiced.

3. In its original form, § 482 applied only to motor vehicle liability policies. By Ch. 205 of the Acts of 1966, the General Assembly repealed and reenacted the statute in its present form.

ly, "claims made" (or "discovery") policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. There are, of course, hybrids of the two varieties. [Parker, *The Untimely Demise of the "Claims Made" Insurance Form? A Critique of Stine v. Continental Casualty Company,* 1983 Det.C.L.Rev. 25, 27–28 (footnotes omitted).]' "

St. Paul's position is, quite simply, that the subject policy is a claims made policy, that it defines when a claim is made as "the date you first report an incident or injury to us or our agent," and that here the claim was not made, in accordance with that definition, while the policy was in effect. Under that reading of the policy, there never has been any claims made coverage for Platzer's claim, St. Paul has not disclaimed coverage by basing the disclaimer on the insured's failure to give notice required under the policy, and, consequently, § 482 does not apply.

■ The premise of St. Paul's argument is that the clause—"When is a Claim Made?"—exclusively controls how a claim is made under this policy. St. Paul treats that clause as a special definition which changes the ordinary meaning of "claim made." The ordinary meaning of "claim made" refers to the assertion of a claim by or on behalf of the injured person against the insured. In this case Platzer's claim was made, in the ordinary meaning, during the policy period. St. Paul reads the policy specially to define "claim made" as the reporting of a claim or potential claim by the insured to the insurer. On that basis the claim was not made until after the policy had expired.

Reading the policy as a whole leaves St. Paul's interpretation far from clear. The policy is, at a minimum, ambiguous on whether a claim is made only by the insured's reporting to the carrier, and ambiguous on whether a claim can ever be made solely by the injured person's assertion of a claim against the insured. The policy can fairly be read (1) to cover unreported claims made (in the ordinary meaning) during the policy period and (2) to give a power to the

insured to effect coverage during the policy period for a claim which has not yet been made (in the ordinary meaning) but which the insured anticipates will be made (in the ordinary meaning). The insured may effect the latter expansion of basic coverage by reporting an anticipated claim to the insurer before that claim is made (in the ordinary meaning). In other words, the policy can be read to be a hybrid of claims made and reporting.

Demonstrating the ambiguity requires immersion in the policy as a whole. The introduction page and two other pages of the policy are headed "Physicians and Surgeons Professional Policy—Claims Made." The policy advises that "[w]e [*i.e.*, St. Paul] have written this policy in plain English" and "in clear, straightforward English."[4] The page containing the insuring agreement is introduced by the following:

"**Important Note:** This is a claims made coverage. Please read it carefully, especially the When A Claim Is Made and Optional Reporting Endorsement sections."

The basic insuring agreement provides "protection against professional liability claims which might be brought against you in your practice as a physician or surgeon."

The page containing the insuring agreement, after explaining the monetary limits of the coverage, presents two clauses which we shall call, respectively, the "Basic Coverage Clause" and the "Accelerated Coverage Clause." They read in full:

"**When you're covered** [Basic Coverage Clause]
"To be covered the professional service must have been performed (or should have been performed) after your retroactive date that applies. The claim must also *first* be made while this agreement is in effect.

---

**4.** It seems somewhat inconsistent with the representation of "plain" English that the policy would contain, as the insurer urges, an exclusive definition of "claim made" which differs from the ordinary meaning of those words. Seemingly it would be more "straightforward" to label the policy "Physicians and Surgeons Professional Policy —Reporting."

**"When is a claim made?** [Accelerated Coverage Clause]
"A claim is made on the date you *first* report an incident
or injury to us or our agent. You must include the
following information:

· Date, time and place of the incident.
· What happened and what professional service you per-
formed.
· *Type of claim you anticipate.*
· Name and address of injured party.
· Name and address of any witness."

(Emphasis added).

When the two clauses are read together in their entire-
ties, the first clause seems to cover "claims made," using
the ordinary meaning, while the second clause seems to deal
with claims which have not been made, using the ordinary
meaning, but which are anticipated to be so made and must
be reported by the insured in order to become covered in
their anticipatory state. St. Paul reads the "Accelerated
Coverage Clause" as the policy definition. But, because
every report "must" contain the "[t]ype of claim you antic-
ipate," the clause seems to address only part of the claims
spectrum. Further, we shall see, *infra*, that St. Paul's
definition does not fit in other parts of the policy.

St. Paul relies heavily on three decisions involving claims
made policies in which the courts held there was no cover-
age where the claim was not reported until after the policy
had expired. Contrasting the policy language in those
cases with that of the St. Paul policy presented here is
instructive.

In *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J.
304, 495 A.2d 395 (1985), the coverage clause of the insuring
agreement read:

"To pay on behalf of the insured all sums which the
insured shall become legally obligated to pay as money
damages because of any claim or claims first made
against the insured and reported to the company during
the policy period, arising out of an act or omission of the

insured in rendering or failing to render professional services for others...."

*Id.* at 307, 495 A.2d at 396–97. In *City of Harrisburg v. International Surplus Lines Ins. Co.,* 596 F.Supp. 954 (M.D.Pa.1984), *aff'd without op,* 770 F.2d 1067 (3d Cir. 1985), the coverage clause read:

"The Company will pay on behalf of the Insureds all Loss the Insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period."

*Id.* at 958. In the third case relied upon, the insurer was obligated "to indemnify the insured on account of damages paid 'because of any claim or claims ... first made against the insured and reported to the Company during the policy period.'" *New England Reinsurance v. National Union Fire Ins. Co.,* 654 F.Supp. 742, 744 (C.D.Cal.1986), *rev'd* 822 F.2d 887, *vacated, withdrawn, reh'g granted* 829 F.2d 840 (9th Cir.1987).

The policy in *Zuckerman* also contained a provision which might be analogized to the Accelerated Coverage Clause in the St. Paul policy. The clause in *Zuckerman* read:

"A claim is first made during the policy period or extended reporting period if: (a) during the policy or extended reporting period the insured shall have knowledge or become aware of any act or omission which could reasonably be expected to give rise to a claim under this policy and shall during the policy period or extended reporting period give written notice thereof to the Company in accordance with Condition VII."

100 N.J. at 308, 495 A.2d at 397. It is not altogether clear whether the above-quoted clause was intended to expand the coverage clause from claims made (in the ordinary meaning) to permit including, by reporting, anticipated claims as well, or whether the above-quoted clause is a policy definition. That lack of clarity, however, does not result in the material ambiguity presented here. That is

because the coverage clause in *Zuckerman* (as well as in *City of Harrisburg* and in *New England Reinsurance*) specifically required reporting during the policy period, even if the claim were made (using the ordinary meaning) during the policy period. The St. Paul policy does not clearly do that.

In the policy before us, under St. Paul's contention, if a "reporting" definition of "claim made" is inserted in the Basic Coverage Clause, the two uses of "first" create a redundancy. There is no need to say in the Basic Coverage Clause that a claim must "first be made" while the policy is in effect if the only way in which a claim can be made is if the insured "first report[s]" the claim while the policy is in effect.

If "claim ... first ... made" is read in the ordinary sense in the Basic Coverage Clause, the double use of "first" can be explained by what *Zuckerman* calls the "moral hazard."

> "The reasonableness of excluding claims based on prior conduct that the insured could reasonably have foreseen might serve as the basis for a future claim is apparent. The insurance company is entitled to protect itself against the professional who, recognizing his past error or omission, rushes to purchase a 'claims made' policy before the error is discovered [by the injured person] and a claim asserted against [the professional]. ... This insurance company concern has been termed the 'moral hazard.'"

100 N.J. at 320 n. 3, 495 A.2d at 403–04 n. 3 (citation omitted). The policy in *Zuckerman* met this problem by excluding claims

> "'arising out of any acts or omissions occurring prior to the effective date of this policy if the insured at the effective date knew or could have reasonably foreseen that such acts or omissions might be expected to be the basis of a claim or a suit.'"

*Id.* at 308–09, 495 A.2d at 397.

The subject St. Paul policy does not contain a comparable specific exclusion. If coverage solely depends on whether

the insured reported the claim to St. Paul during the policy period, the insured could bring about coverage under the subject policy simply by delaying any report to the insurer of an antecedent claim made in the ordinary sense. During the period prior to the effective date the insured either might have had no policy at all, or might have exhausted the monetary limits of a prior policy. The St. Paul policy does state that it "will be void if you ... hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter concerning this insurance—either before or after a loss." If the exclusive manner of effecting coverage under the St. Paul policy is by reporting, it is debatable whether the fact that a claim is anticipated or has been made before the effective date of the policy is "important information" and the efficacy of the fraud provision as a protection to St. Paul becomes questionable. Given no more specific clause than the fraud provision, it seems logical to have coverage attach under the St. Paul policy to a claim made before the policy period but reported during the policy period, if, as St. Paul contends, a claim made during the policy period but reported after the policy period is not covered. On the other hand, if in the Basic Coverage Clause the ordinary meaning is given to the sentence reading: "The claim must also first be made while this agreement is in effect," then St. Paul is at least partially protected from the moral hazard, to the extent of claims first made prior to the policy period.

St. Paul's definitional approach is also inconsistent with the policy provisions dealing with termination of coverage. The policy gave Dr. House the option, which he did not exercise, of purchasing a reporting endorsement, described as follows:

"This reporting endorsement will cover:

• Injuries or deaths that occur after the retroactive date and before that date this agreements ends. And

• Claims that are *first made or reported* to us after the ending date of this agreement and before the reporting endorsement ends."

(Emphasis added). For purposes of the reporting endorsement claims "made" and claims "reported" expressly are treated as alternative events causing coverage to attach. Thus, reporting cannot be the exclusive meaning of "claim made" as the result of a definition applicable throughout this policy. Further, one is hard pressed to conceive of any reason why the actual assertion of a claim is an alternative to reporting as a means of having coverage attach during the extension period under the reporting endorsement, but actual assertion of a claim is not an alternative means of having coverage attach during the basic policy period. Because the policy contemplates that the reporting endorsement will have a definite termination date, St. Paul will still have the "tail" problem of a covered claim made, in the ordinary meaning, which has not been reported during the extension period. Yet, St. Paul argues that the reason why coverage arises only on reporting during the basic policy period is to avoid that very problem of covered claims unknown to the insurer.

The plain English version of traditional notice provisions found in the subject policy is also seemingly at odds with St. Paul's interpretation. Those provisions read in part:

**"Someone Is Injured Or Something Happens Which Can Result In A Liability Claim**

"If there's an accident or incident covered under this policy you or any other protected person involved must:

"1. Tell us or our agent what happened as soon as possible. Do this even though no claim has been made but you or another protected person is aware of having done something that may later result in a claim. This notice should include:

. . . .

"• The specific nature of the incident including the type of claim that may result[.]

. . . .

"3. Send us copies of all demands or legal documents if someone makes a claim or starts a lawsuit."

Manifestly the ordinary meaning of "claim made" is used in the first and third paragraphs of the above-quoted provisions. Indeed, paragraph 1 encourages the insured to effect coverage by using the Accelerated Coverage Clause even if coverage has not been effected under the Basic Coverage Clause by the actual assertion of a claim by the injured person.

St. Paul's interpretation also means that reporting becomes increasingly more difficult the closer a claim is made (in the ordinary meaning) to a policy's expiration, here, "at 12:01 a.m., standard time," on January 1, 1986. If coverage can be obtained only by reporting, reporting ultimately becomes practically impossible within the policy period, *e.g.*, when the injured person asserts an unanticipated claim late on the last day of the policy period. This difficulty is avoided if the Basic Coverage Clause is triggered by a "claim made," in the ordinary meaning. St. Paul's answer is that the insured should purchase the optional reporting endorsement and that, otherwise, the insured will be obtaining coverage for a period of time for which no premium has been paid. That analysis would carry more force if this optional reporting endorsement were designed only to allow reporting after the policy period for claims made within the policy period. Here, claims "reported" and claims "first made" after policy expiration are each covered by the optional reporting endorsement, if purchased. This suggests that the purposes of the optional reporting endorsement include providing coverage under the St. Paul policy for a physician who retires from practice or who changes coverage to an occurrence policy.

Here the policy can be read as St. Paul contends. It can just as easily be read to have afforded coverage when a claim is made, using the ordinary meaning. The ambiguity results from what might have been an intentional trade off on the part of St. Paul in drafting the policy, whereby precision of language on the finer points of coverage was sacrificed in order to use fewer words, so as to justify the "simple English" labeling of the contract. In any event,

under ordinary rules of contract construction, a genuine ambiguity should be resolved against the party who prepared the contract. *See Vollmer*, 306 Md. 243, 508 A.2d 130; *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486 (1985); and *Truck Ins. Exch. v. Marks Rentals*, 288 Md. 428, 418 A.2d 1187 (1980).[5]

■ Under the alternative interpretation the Platzer claim was covered when it was made during the policy period. Under this interpretation, the protection to the insurer against delay in reporting by the insured after the claim is made rests on the provision: "If there's an accident or incident covered under this policy you or any other protected person involved must ... [t]ell us or our agent what happened as soon as possible." A policy defense resting on that covenant to give notice is foursquare within Art. 48A, § 482.

For these reasons the Court of Special Appeals reached the correct conclusion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.

Dissenting Opinion by MURPHY, C.J., in which McAULIFFE and BLACKWELL, JJ., join.

MURPHY, Chief Judge, dissenting:

I cannot agree with the majority that the policy at issue is ambiguous. I, therefore, respectfully dissent. I further conclude that Md.Code (1957, 1986 Repl.Vol.) Art. 48A, § 482—which requires that an insurer prove "actual prejudice" when disclaiming coverage due to the insured's failure to provide requisite notice to the insurer of a claim—is inapplicable to the insurance policy involved in this case.

---

**5.** We intimate no opinion on the construction of § 482 if its application is sought, under circumstances similar to those before us, to a claims made policy which unambiguously defines "claim made" to mean only "claim reported."

## I.

By attaching its own self-created labels to selected policy provisions, the majority clouds the interpretation and meaning of an essentially straightforward liability policy. First, the policy provision containing the insuring agreement clearly indicates that it is of the "claims made" type; it directs special attention to the provisions entitled "When is a claim made" and "Optional reporting endorsement." In describing the scope of coverage, the policy specifically states that "[t]he claim must ... first be made while this agreement is in effect." The next clause defines "When a claim is made" as "the date you first *report* an incident or injury to us or our agent. (emphasis supplied)." The report to the insurer must contain the following information:

—Date, time and place of the incident.
—What happened and what professional service you performed.
—Type of claim you anticipate.
—Name and address of injured party.
—Name and address of any witness.

It is therefore clear that reporting is a prerequisite to coverage, whether the insured reports a demand made against him by an injured person, or whether the insured reports an incident which may lead to this kind of a demand.

The other policy provisions do not weaken the clarity of the reporting requirement. The clause describing the coverage of the optional reporting endorsement, for example, states that it will cover "[c]laims that are *first made or reported to us* after the ending date of this agreement and before the reporting endorsement ends." (emphasis supplied). The phrase "made or reported to us" does not offer an alternative; it simply refers back to the definition of "claims made" under the policy. This language reminds the insured that a claim, to be "made," must be reported to the insurer. The majority is creating ambiguity where none exists.

The same is true of the majority's interpretation of the provisions under the section concerning "What To Do If You Have A Loss"—"Someone Is Injured Or Something Happens Which Can Result In A Liability Claim." It is obvious that the "claims" referred to therein are "liability claims" by an injured person against the insured. This language does not create an ambiguity and does not cast any doubt on the policy's requirement of reporting before coverage can exist.

Therefore I find the policy requirement of reporting to the insurer before coverage attaches to be unambiguous, and proceed now to address the issue on which certiorari was granted—the proper application of § 482 to this reporting-type claims made liability policy.

## II.

As the majority points out, *Watson v. U.S.F. & G. Co.,* 231 Md. 266, 189 A.2d 625 (1963) held that an insurance company need not show prejudice when disclaiming coverage for late notice. When *Watson* was decided, its holding was in accord with the majority of courts in the country. These courts tended to interpret insurance policies on a strict contractual basis, and generally viewed the notice provision as a condition precedent, which, if not met, defeated coverage under the policy. *See* 8 Appleman, *Insurance Law and Practice,* § 4732 (1981); *Watson, supra,* 231 Md. at 271, 189 A.2d 625.

A number of jurisdictions undertook in various ways to change the *Watson*-type result in late notice cases. Some courts held that if the delay in notice is unreasonable, it creates a rebuttable presumption of prejudice, which the insured must then meet with proof that the delay was non-prejudicial. *See Tiedtke v. Fidelity & Casualty Co.,* 222 So.2d 206 (Fla.1969); *Zurich Ins. Co. v. Valley Steel Erectors, Inc.,* 13 Ohio App.2d 41, 233 N.E.2d 597, 599 (1968). Other courts held that prejudice to the insurer is a factor in determining the reasonableness of the delay in notice. *See Illinois Ins. Guaranty Fund v. Lockhart,* 152

Ill.App.3d 603, 105 Ill.Dec. 572, 576, 504 N.E.2d 857, 861 (1987); *Greer v. Zurich Insurance Company*, 441 S.W.2d 15, 32 (Mo.1969); *Wendel v. Swanberg*, 384 Mich. 468, 185 N.W.2d 348 (1971).

The majority of jurisdictions which consider prejudice to the insurer have applied a two-step test, requiring that the omission or delay of notice be unreasonable or unexcused before prejudice to the insurer is considered. *See* Annot., 32 A.L.R.4th 141, 156, n. 9 (1984).[1] *Cooper v. Government Employees Ins. Co.*, 51 N.J. 86, 237 A.2d 870 (1968), for example, held that the insurer, in order to disclaim coverage, must show "both a breach of the notice provision and a likelihood of appreciable prejudice." *Id.* 237 A.2d at 874. In *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977), the court held that "the preferable rule is that which requires the insurance company to prove not only that the notice provision was breached, but also that it suffered prejudice as a consequence." *Id.* 371 A.2d at 196.

Some jurisdictions, like Maryland, have adopted a prejudice rule by statute. *See, e.g.,* Wis.Stat.Ann. § 631.81 (West 1980); Mass.Gen.L. ch. 175, § 112 (1987). Wisconsin's statute, for example, provides:

"Provided notice or proof of loss is furnished as soon as reasonably possible and within one year after the time it was required by the policy, failure to furnish such notice or proof within the time required by the policy does not invalidate or reduce a claim unless the insurer is prejudiced thereby and it was reasonably possible to meet the time limit."

This statute has been interpreted as creating only a rebuttable presumption of prejudice when notice is given more than one year after the required time. *Gerrard Realty*

---

1. This annotation is entitled: "Modern Status of Rules Requiring Liability Insurer to Show Prejudice to Escape Liability Because of Insured's Failure or Delay In Giving Notice of Accident or Claim, or in Forwarding Suit Papers."

*Corp. v. Am. States Ins. Co.,* 89 Wis.2d 130, 277 N.W.2d 863, 872 (1979).

Maryland's statute, § 482, created a prejudice rule requiring both that the insured have "breached the policy . . . by not giving requisite notice to the insurer" and that the insurer establish, "by a preponderance of affirmative evidence that such lack of . . . notice has resulted in actual prejudice to the insurer." One legal commentator has noted three factors which may have prompted the General Assembly to change the *Watson* rule:

"First, an aura of unfairness emanates from a situation in which an insurance company is permitted to disclaim liability when it is not prejudiced by the insured's breach of a condition precedent. In such a situation, the insurer receives an unjustifiable windfall. Second, the *Watson* rule allows an unreasonable forfeiture by permitting the insurer's assertion of a technical irregularity to deny protection for which the insured has paid. Finally, allowing an insurer to disclaim liability has the undesirable effect of leaving victims of automobile accidents uncompensated by their paid-for insurance coverage." 38 Md.L. Rev. 299, 309–10 (1978).

A survey of other jurisdictions which have adopted a prejudice rule reveals two basic lines of reasoning. First, these courts have found that the strict contractual condition precedent approach creates a forfeiture. The New Jersey Supreme Court, in *Cooper, supra,* reasoned that

"although the policy may speak of the notice provision in terms of 'condition precedent,' . . . nonetheless what is involved is a forfeiture, for the carrier seeks, on account of a breach of that provision, to deny the insured the very thing paid for. This is not to belittle the need for notice of an accident, but rather to put the subject in perspective. Thus viewed, it becomes unreasonable to read the provision unrealistically or to find that the carrier may forfeit the coverage, even though there is no likelihood

that it was prejudiced by the breach." 237 A.2d at 873–74.

In *Brakeman, supra,* 371 A.2d at 196, the court stated that "[a] strict contractual approach is also inappropriate here because what we are concerned with is a forfeiture. The insurance company in the instant case accepted the premiums paid by the insured for insurance coverage and now seeks to deny that coverage on the ground of late notice."

*See also Ouellette v. Maine Bonding & Cas. Co.,* 495 A.2d 1232 (Me.1985) (forfeiture creates an undeserved windfall for the insurer); *Pickering v. American Employers Insurance Co.,* 109 R.I. 143, 282 A.2d 584, 593 (1971) ("a technical breach of the notice provisions in a policy should [not] bar an insured from recovering the benefits for which he has paid").

A second line of reasoning is based upon the purpose and function of the notice provision. In *Brakeman, supra,* 371 A.2d at 197, the court reasoned:

"The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim. . . .

". . . [A] reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been in had timely notice been provided, e.g., being forced to pay a claim against which it has not had an opportunity to defend effectively. In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness

to relieve the insurance company of its obligations under the policy in such a situation."

*See also Weaver Bros., Inc. v. Chappel*, 684 P.2d 123, 125 (Alaska 1984) ("In short, the notice requirement is designed to protect the insurer from prejudice. In the absence of prejudice, regardless of the reasons for the delayed notice, there is no justification for excusing the insurer from its obligations under the policy."); *Great American Ins. Co. v. C.G. Tate Const.*, 303 N.C. 387, 279 S.E.2d 769, 771, 774 (1981) ("[T]his provision, although denominated by the policy as a condition precedent, should be construed in accord with its purpose and with the reasonable expectations of the parties. * * * No condition of timely notice will be given a greater scope than required to fulfill its purpose."); *Lusch v. Aetna Casualty & Surety Company*, 272 Or. 593, 538 P.2d 902 (1975); *Miller v. Marcantel*, 221 So.2d 557, 559 (La.App.1969) ("The function of the notice requirements is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice.").

Although there is no explicit indication of the General Assembly's intent in enacting § 482, it appears most likely that one of the "evils" which it sought to remedy was the working of an unreasonable forfeiture which created a windfall for the insurer. See *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987), noting that legislative intent may be discovered, at least to some extent, by examining the purpose to be attained and the evils to be remedied. In this regard, *Watson, supra*, 231 Md. at 273, 189 A.2d 625, relied on reasoning in *State Farm Mut. Automobile Ins. Co. v. Cassinelli*, 67 Nev. 227, 216 P.2d 606 (1950). That case, while following "the overwhelming majority of decisions throughout the United States," held that a prejudice rule should not apply. 216 P.2d at 615. Yet it noted that "arguments in favor of such rule seemed plausible and the rule itself appeared neither unfair nor inequitable." *Id.* The *Cassinelli* court also suggested that

"[p]erhaps legislation is in order declaring invalid, clauses in an indemnity policy avoiding or forfeiting the indemnity on account of failure to comply with notice provisions unless coupled with the fact that such failure was prejudicial to the insurance company, and with possible further provisions as to presumptions, burden of proof, etc. This of course is a matter for the good judgment of the legislature if it is thought that adherence to the present rule is too harsh in its effects." *Id.* 216 P.2d at 616.

It is also likely that the result sought to be attained by § 482 was the restriction of the effect of the notice condition to its intended purpose. In *Lewis v. Commercial Cas. Ins. Co.*, 142 Md. 472, 121 A. 259 (1923), we discussed the purpose of the notice provision of an insurance policy:

"[T]he wisdom of requiring an immediate written notice of the accident or loss resulting therefrom, covered by the policy, with the fullest information obtainable at the time of the accident, is apparent, as was recognized by the court in *McCarthy v. Rendle*, 230 Mass. 35 [119 N.E. 188 (1918)], in which it is said: 'The occurrence of an accident and injury, however slight, may result in litigation, even in protracted litigation. It is the experience of every defender of causes that it is a matter of first importance to become possessed of all material facts, and of the names and residences of all known witnesses at the earliest possible moment, as facts may be forgotten or distorted and witnesses may go beyond reach. It is an important provision in that it is "for the protection of the insurer against fraudulent claims, and also against those which, although made in good faith, are not valid." ' " 142 Md. at 480, 121 A. 259.

That § 482 allows a notice provision to fulfill this purpose without going beyond it is, I think, quite clear.

### III

St. Paul argues that the inherent nature of "claims made" policies renders § 482 inapplicable. It points to the difference between these types of liability policies and so-called

"occurrence" type policies, as explicated by us in *Mut. Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 508 A.2d 130 (1986). There, we quoted extensively from *Stine v. Continental Casualty Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984):

> "Coverage in an 'occurrence' policy is provided no matter when the claim is made, subject, of course, to contractual and statutory notice and limitations of actions provisions, providing the act complained of occurred during the policy period. Because the insurer's liability in such policies ordinarily relates to a definite, easily identifiable and notorious event such as an automobile accident, a fire, a slip and fall injury, or a ship collision, the insurer is ordinarily able to conduct a prompt investigation of the incident and make an early assessment of related injuries and damages with the result that actuarial considerations permit relative certainty in estimating loss ratios, establishing reserves, and fixing premium rates." 349 N.W.2d at 131.

As to "claims made" policies written to cover professional liability, *Stine* noted that they were of relatively recent origin and were developed primarily to deal with situations in which the negligent act is difficult to pinpoint and may have occurred over an extended period of time. As to these policies, the court observed:

> "[T]he error or omission may be a discrete act or failure to act, or it may consist of a lengthy process and remain latent and undiscoverable for a number of years. Examples include a physician's misdiagnosis, an attorney's fraudulent concealment, or an architect's defective design. From an underwriting perspective, occurrence policies are unrealistic for such risks because of the long or open 'tail' exposure which results. When the 'event' intended to be covered cannot easily be fixed and the liability for the consequent injury extends long into the future, often well after expiration of the policy, considerations of inflation, upward spiraling jury awards, and legislative and judicial adoption of newly developing con-

cepts of tort law mean that actuarial factors, including fixing premium rates and establishing adequate reserves, are highly speculative. The result, logically, is the establishment of a premium rate schedule sufficiently high to accommodate 'worst scenario' jury verdicts returned years after the error, omission, or negligent act." *Id.* "Claims made" policies, the court said,

"meet such difficulties by enabling the insurer to underwrite the risk, compute the premiums, and establish reserves with greater accuracy, safe in the assumption that liability will be limited to claims actually made during the term of the policy for which the premium is computed. When the policy term expires, the insurer knows exactly what its exposure is, at least in terms of the nature and number of 'claims made'. As a result, the insurer is better able to predict the limits of its exposure and more accurately estimate the premium rate schedule necessary to accommodate the risk undertaken." *Id.*

Finally, the *Stine* court addressed the benefits to the insured in purchasing a claims made policy. It said:

"Since the insurer can limit the duration of its exposure to the term of the policy currently in force, the more precise actuarial data available enable it to charge a lower premium than would be necessary for an occurrence policy. Another advantage to the insured is the ability, if desired, to purchase insurance which will cover acts or omissions during a period prior to the inception of the policy, providing only that any claim is made during the policy period and any extensions thereof. Claims made policies are also useful to the professional person to provide excess coverage in addition to 'occurrence' policy coverage purchased much earlier, the maximum limits of which are now unrealistically low...." *Id.*, 349 N.W.2d at 131–32.

*See Vollmer, supra,* 306 Md. at 253–54, 508 A.2d 130.

There are various types of policies within the claims made category. So-called "pure" claims made policies generally define "claims made" as all claims brought against the

insured within the policy period. The claim made against the insured party is the event which invokes coverage. The policy may also be of a "reporting" type, defining "claims made" as all claims made against the insurer by the insured during the policy period. Thus, the claim made against the insurer is the event invoking coverage in a "reporting" type of claims made policy.

Claims made policies may also differ in their scope of coverage. Some policies, for example, are very restrictive and cover only those claims made which are based on actions or omissions which fall within the policy period. *See Stine v. Continental Cas. Co.,* 419 Mich. 89, 349 N.W.2d 127 (1984). More commonly, however, the policy will include a "retroactive date" for a period of years, and will provide coverage for claims made which are based on actions or omissions during the retroactive period and the policy period.

Some claims made policies even include "occurrence-type" language which allows the insured to report to the insurer those occurrences which are likely to lead to future claims, thereby invoking coverage for these incidents if and when a claim is made. *See Zuckerman v. Nat. Union Fire Ins.,* 100 N.J. 304, 495 A.2d 395, 397 (1985). *Cf. City of Harrisburg v. Intern Surplus Lines Ins.,* 596 F.Supp. 954, 958 (M.D.Pa.1984).

The policy issued by St. Paul to Dr. House is of the "reporting" type, defining a "claim made" as the report of an accident or injury *to the insurer* or its agent. The policy was in effect from January 1, 1983 to January 1, 1986, and included a retroactive date of January 1, 1977. Therefore, any incidents or claims reported to St. Paul before January 1, 1986 and based on the provision or withholding of professional medical services during the period from January 1, 1977 to December 31, 1985 were covered. The policy also included "occurrence-type" language, allowing Dr. House to report an incident or injury to St. Paul even if a specific claim against him had not yet been made. In addition, the

policy required that the insured notify St. Paul or its agent of an incident or injury "as soon as possible." [2]

## IV

### (A)

Section 482, as already noted, appears to have been enacted to remedy the harsh result of the *Watson* case. In interpreting this statute, we seek to discover the purpose, aim or policy behind it. *Kaczorowski, supra,* 309 Md. at 513, 525 A.2d 628. Our initial inquiry must be to examine the language of the statute, "because what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal." *Id.* This involves the so-called "plain-meaning" rule of statutory construction, which holds that a plainly worded statute must be construed "without forced or subtle interpretations designed to extend or limit the scope of its operation." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986).

---

**2.** Dr. House's policy provided:
"If there's an accident or incident covered under this policy you or any other protected person involved must:
1. Tell us or our agent what happened as soon as possible. Do this even though no claim has been made but you or another protected person is aware of having done something that may later result in a claim. This notice should include:
The time and place of the event;
The protected persons involved;
The specific nature of the incident including the type of claim that may result; and
The name and addresses of any injured people and witnesses.
2. Notify the police if a law may have been broken.
3. Send us copies of all demands or legal documents if someone makes a claim or starts a lawsuit.
4. Cooperate and assist us in securing and giving evidence, attending hearings and trials, and obtaining the attendance of witnesses.
5. Refrain from taking on any financial obligations or paying out any money without our authorization.
Doing so may result in our not making reimbursement of the payment even though the cost is covered by the policy. But this rule doesn't apply to money spent for emergency first aid to others at the time of an accident."

We have also noted that the "plain-meaning rule is not rigid," *Kaczorowski, supra,* 309 Md. at 513, 525 A.2d 628, and that

"where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Id.* (citations omitted; quoting *Tucker, supra,* 308 Md. at 75, 517 A.2d 730).

Even where no ambiguity exists, however, we have held that even the "plainest language" is "controlled by the context in which it appears." *Id.* at 514, 525 A.2d 628. In *Kaczorowski,* we explained:

"Sometimes the language in question will be so clearly consistent with apparent purpose (and not productive of any absurd result) that further research will be unnecessary. But on other occasions much more extensive inquiry will be required....

"... [I]n *Potter v. Bethesda Fire Department,* 309 Md. 347, 524 A.2d 61 (1987) ..., Judge Orth, quoting *State v. Fabritz,* 276 Md. 416, 421–422, 348 A.2d 275, 278–279 (1975), *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976), made it plain (At 351–55, 524 A.2d at 63–64) that legislative purpose is critical, that purpose must be discerned in light of context, and that 'statutes are to be construed reasonably with reference to the purpose to be accomplished....' The purpose, in short, determined in light of the statute's context, is the key. And that purpose becomes the context within which we apply the plain-meaning rule. Thus ' "results that are unreasonable, illogical or inconsistent with common sense should be avoided ... with the real legislative intention

prevailing over the intention indicated by the literal meaning." ' *Id.* at 353, 524 A.2d at 64." *Id.* at 515–16, 525 A.2d 628 (citation and footnote omitted).

I shall now apply these principles to the instant case.

## (B)

St. Paul advances a number of arguments based on the language of § 482. First, it claims that a "disclaimer" and a "denial" of coverage are two very different things. It asserts that the former term applies only when coverage under the policy has attached, but because of the failure of a technical condition, the insurer refuses to provide that coverage. An example, in the context of an occurrence policy, would be a case in which the accident has occurred within the policy period, but, due to late notice or lack of cooperation by the insured, that coverage is lost. "Denial," however, applies in those situations in which coverage never attaches, for example, when the accident occurs *after* the policy period. St. Paul argues that it is asserting a *denial* of coverage, not a disclaimer, and § 482 is therefore not applicable because the statute, by its own terms, applies only when an insurer "seeks to disclaim coverage."

St. Paul also argues that the Court of Special Appeals erred in interpreting the meaning of the word "any" in § 482.[3] It claims that the court arbitrarily concluded that "any" means "all" or "every," instead of "some," "one out of many" or "either," which are also included in the definition of "any." *See* Black's Law Dictionary 86 (5th ed. 1979).

Neither of the foregoing arguments is persuasive. The distinction between a "disclaimer" of coverage and a "denial" of coverage, although it may be a valid logical distinction, is not clear from the language of the statute, nor has any Maryland case made such a distinction with regard to § 482. I also agree with the Court of Special Appeals that,

---

**3.** The 1966 amendment to § 482 made it applicable to "any insurer" and "any policy of liability."

in the context used, the word "any," as applied to an insurer or to a policy of liability insurance, means "every" or "all."

The definition of the word "any," however, is not dispositive, for there are other terms within the statute which modify or restrict its scope. While it is true that § 482 *potentially* applies to "any" liability insurer or policy, it is also true that the statute requires that the basis for the disclaimer or denial of coverage be that "the insured has *breached* the policy . . . by not giving requisite notice to the insurer" (emphasis supplied). St. Paul therefore argues that there was in fact no "breach" of the policy in this case.

As noted above, § 482 encompasses a two-part test. Without the required breach of the notice provision, prejudice to the insurer is immaterial and the statute does not apply. The pertinent inquiry, then, is whether Dr. House breached the St. Paul policy by reporting the claim after the policy had expired.

A breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract. *See* Black's Law Dictionary 171 (5th ed. 1979). That Dr. House did not perform his promise to St. Paul to inform it of any claim as soon as possible and within the policy period is clear. The first question, however, is whether this failure was "without legal excuse." It seems that Dr. House's failure to inform St. Paul before the policy had expired was *not* "without legal excuse." Dr. House was legally bound to report claims to St. Paul, but only if he wanted coverage for them. If Dr. House chose not to invoke this coverage, St. Paul would have no legal right or action against him to force him to report the claim; indeed, choosing not to report an accident or claim to one's insurance company in these circumstances is not a breach of contract.

The problem arose, of course, when Dr. House finally chose to report the claim to St. Paul. The fundamental question now is whether, at the time he reported the Platzer

claim, there existed a contract between the parties, for one cannot breach a contract which is not in existence.

To answer this question, I look again to the nature of claims made and occurrence policies. Both types of policies include provisions which define (1) the events for which coverage is provided and (2) when and how coverage can be initiated. For example, an occurrence policy has a fixed time period defining what specific events or occurrences will be covered. When this time period ends, however, the insurer's responsibilities under the policy do not end, for it may be held liable for the covered events, barring statutes of limitations, at any time thereafter.

Claims made policies are almost the mirror image of occurrence policies in that they often cover claims based on events which occurred many years *before* the policy came into effect, but limit the scope of coverage to claims based on these events which are made within the limited time period of the policy. Unlike the occurrence policy, the insurer's potential liability ends when the policy expires.

Therefore, when the claims made policy at issue here expired there was nothing left. The policy could not be breached because there was no longer a policy to be breached. Any claim made after its expiration is of the same effect as an accident or event which occurs after the "expiration" of an occurrence policy. There was no breach; there was simply no coverage. I therefore think that § 482 is inapplicable to a "reporting" type of claims made policy when the claim is made after the expiration of the policy.

## V

This result is not only mandated by the plain language of § 482, but is also in accord with its intent and with the weight of authority in the other jurisdictions which have dealt with this issue.

As already noted, the main reasons for adopting prejudice rules like § 482 have been a concern with unreasonable forfeitures and the need to restrict the effect of the notice

condition to its intended purpose. In the context of a claims made policy, these concerns are of less import. Allowing St. Paul to deny liability in this case does not work a forfeiture, for the insured has received all of the coverage for which he has paid. The policy clearly covered claims reported to the insurer within the policy period, and this coverage was provided. This is not a case, therefore, in which the insured reasonably believed he was covered, only to lose that coverage due to breach of a technical notice condition. Here, when the policy expired, there was no further chance for coverage to attach. Having taken advantage of the lower cost benefits of a claims made policy, Dr. House cannot rightfully complain of its limited scope.[4]

Moreover, the purposes and function of the notice requirements in a claims made policy are fundamentally different than in an occurrence policy. The purpose of a claims made policy's notice provision is two-fold. It serves not only to protect the insurer from prejudice, but also to define the scope and extent of coverage. In *City of Harrisburg v. Intern. Surplus Lines, Inc.*, 596 F.Supp. 954 (M.D. Pa.1984), the insured under a claims made "reporting" type policy reported the claim to the insurer approximately 15 months after the policy had expired. In discussing the applicability of Pennsylvania's prejudice rule, announced in *Brakeman, supra,* the court stated:

"[W]e conclude that the notice provision of a claims-made policy serves a materially different purpose from one in an occurrence policy. The notice provision of a claims-made policy is just as important to coverage as the requirement that the claim be asserted [against the insured] during the policy period. If the insured does not give notice within the contractually required time period, in the instant case 'during the policy period,' there is

---

4. I would also note that Dr. House was given an opportunity to purchase an optional reporting endorsement which would have covered claims made after the expiration of the policy period. This option was offered by St. Paul to Dr. House by a letter dated January 8, 1986, but Dr. House did not purchase the extended reporting coverage.

simply no coverage under the policy." *Id.* 371 A.2d at 961.

Notice to the insurer under the St. Paul policy serves not only to allow the insurer time to investigate and settle the claim, but also to determine if the claim itself is within the scope of the policy. There can be no coverage for claims reported after the policy has expired because notice is the event which invokes coverage and all possibility of coverage ends when the policy ends.

Other jurisdictions which have dealt with this issue are in accord.[5] For example, in *Zuckerman v. Nat. Union Fire Ins.*, 100 N.J. 304, 495 A.2d 395 (1985), an attorney reported a claim, which was made against him during the policy

---

**5.** Dr. House cites *Stine v. Continental Cas. Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984), as supportive of his position that § 482 must apply in this case. In *Stine,* the plaintiff attorney's claims made-type professional liability policy required that the claim be "*'made against the insured during this policy period* and reported in writing to the Company during this policy period or within 60 days after the expiration of this policy period.'" *Id.,* 349 N.W.2d at 129 (emphasis in original). Both the claim against the attorney and his report to the insurer occurred after the policy had lapsed.

The plaintiff claimed that Michigan's notice statute, which provides that late notice will not invalidate a policy so long as notice was given as soon as was reasonably possible, required the insurer to defend the claim. The court held that the statute did not apply to the requirement that the claim be made against the *insured* within the policy period, because this essentially defined coverage. *Id.,* 349 N.W.2d at 134. In dicta, however, the court stated that the statute would apply to the requirement of notice to the *insurer* within the policy period. *Id.*

The *Stine* case is inapposite for two reasons. First, the court interpreted the policy as including separate notice requirements. While the requirement of notice to the *insured* defined coverage, the requirement of notice to the *insurer* served basically the same purposes as a notice provision in an occurrence policy. *Id.* Such is not the case with the St. Paul policy.

A second important distinction concerns Michigan's prejudice rule, which is not the two-step test of § 482, but considers prejudice to the insurer to be a material factor in determining the reasonableness of notice. *See Wendel v. Swanberg,* 384 Mich. 468, 185 N.W.2d 348 (1971); *Sherlock v. Perry,* 605 F.Supp. 1001 (E.D.Mich.1985). Since Michigan's prejudice rule is of a completely different nature than § 482, *Stine's* reasoning is not applicable.

period, ten months after the policy had expired. His policy "afforded him coverage for acts or omissions occurring at any time, provided that the claim be asserted and reported to the carrier during the policy period." *Id.*, 495 A.2d at 397. The court declined to apply the prejudice rule of *Cooper, supra,* because the notice provision in the claims made policy defined its coverage, and because the policy at issue fulfilled the "reasonable expectations of the insured with respect to the scope of coverage." *Id.*, 495 A.2d at 406. The Court also noted that "an extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, *gratis,* resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." *Id.*

The court in *City of Harrisburg, supra,* determined that an insurance company which was notified of a claim after the expiration of the policy was not liable.[6] In discussing why the *Brakeman* prejudice rule did not apply, the court noted that the same concerns were not at issue in the claims made policy there involved. First, the lower bargaining power was not pertinent because the plaintiff could have bargained for an occurrence policy or an extended reporting period. Second, the court stated that this situation did not work a forfeiture because "the insured ... paid a lower premium for coverage ... [and to] find for the defendant insurer here would give the plaintiffs exactly what they had bargained for and not less." *Id.* 371 A.2d at 962. The court also said that the purposes of the notice provision in a claims made policy were different than in an occurrence policy in that

"[i]t provides a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves

---

**6.** The court held that the plaintiff, who was a mayor-elect at the time of the event leading to the claim, was not an "insured" under the terms of the policy. The discussion of notice and the prejudice rule is therefore dicta.

for future liabilities and compute premiums with greater certainty." *Id.*

*Gulf Ins. Co. v. Dolan, Fertig and Curtis,* 433 So.2d 512 (Fla.1983) was based on a claim by the insured that the court should, as a matter of public policy, "engraft upon an unambiguous claims-made insurance policy a reasonable additional period of time after the policy period expires for reporting claims that arise late in the contract term." *Id.* at 513. In declining to do so, the court reasoned:

"Notice within an occurrence policy is not the critical and distinguishing feature of that policy type.... Coverage depends on when the negligent act or omission occurred and not when the claim was asserted. ... The giving of notice is only a condition of the policy, and in no manner is it an extension of coverage itself. It does not matter when the insurer is notified of the claim by the insured, so long as the notification is within a reasonable time and so long as the negligent act or omission occurred within the policy period itself.

. . . .

"With claims-made policies, the very act of giving an extension of reporting time after the expiration of the policy period ... negates the inherent difference between the two contract types. Coverage depends on the claim being made and reported to the insurer during the policy period. Claims-made or discovery policies are essentially *reporting* policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches." *Id.* at 515 (emphasis in original).

Consistent with § 482, I conclude that Dr. House's claims made policy with St. Paul did not, in the circumstances of this case, provide the requisite coverage which he has claimed.

Judge McAULIFFE and Judge BLACKWELL have authorized me to state that they join in the views expressed in this dissenting opinion.