700 A.2d 262

**Gerald S. KLEIN, et al.**

v.

**FIDELITY & DEPOSIT COMPANY OF AMERICA.**

**No. 1535, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Sept. 24, 1997.

James P. Ulwick (Severn E.S. Miller and Kramon & Graham, P.A., on the brief), Baltimore, for appellants.

Robert M. Wright (John V. Church and Whiteford, Taylor & Preston, L.L.P., on the brief), Baltimore, for appellee.

Argued before SALMON, EYLER and SONNER, JJ.

SALMON, Judge.

The major challenge presented in this case is to interpret correctly the meaning of the term "claim" as used in a "claims made" directors' and officers' liability insurance policy.[1]

---

1. In *St. Paul Fire & Marine Ins. v. House*, 315 Md. 328, 332–33, 554 A.2d 404 (1989) (quoting *Mutual Fire, Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 252, 508 A.2d 130 (1986)), the Court said:
   "'Generally speaking, "occurrence" policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. Conversely, "claims made" (or "discovery") policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. There are, of course, hybrids of the two varieties. [Parker, *The Untimely Demise of the "Claims Made" Insurance Form: A*

The dispute that gives rise to this issue had its origin in the 1985 Savings and Loan debacle, which ultimately cost Maryland taxpayers over $125,000,000.[2] One of the largest Maryland savings and loan associations that suffered severe financial difficulties in 1985 was the Merritt Commercial Savings & Loan Association ("Merritt"), formerly known as Merritt Savings and Loan, Inc. At all times here relevant, Merritt was a wholly owned subsidiary of Middle States Financial Corporation ("Middle States"). Gerald S. Klein ("Klein") held all outstanding shares of stock in the holding company that owned Middle States. Klein, in turn, controlled numerous other corporations and partnerships in Maryland, many of which were subsidiaries of Merritt.

In 1983, Fidelity Deposit Company of Maryland ("Fidelity") issued a $3,000,000 "Directors and Officers Liability Insurance Policy" ("D & O policy") to Merritt. The D & O policy covered two of Merritt's subsidiaries, Institutional Service Corp. and Merritt Capital Corp., along with some twenty-two subsidiaries of either Institutional Services Corporation or Merritt Capital Corporation. The policy was for "claims made" during the period between August 12, 1983, and October 14, 1986.[3] Under Paragraph 6 of the D & O policy, if the insured received a notice of contemplated claim within the policy period and gave notice of the potential claim to the insurer, that potential claim was to be treated as covered in

---

*Critique of Stine v. Continental Casualty Company,* 1983 Det. C.L.Rev. 25, 27–28 (footnotes omitted).]' "

**2.** The May 5, 1997, issue of The Daily Record paraphrased the Maryland Comptroller, Louis L. Goldstein, as saying:

> Maryland initially estimated its loss from the savings and loan crisis at $500 million. But after nearly 12 years of litigation and the sale of thousands of assets, the loss has been whittled down to $125 million with just one major property remaining unsold.

Mary Pemberton, "Md. S & L Crisis Closer to Closure," *The Daily Record,* May 5, 1997, at 3A.

**3.** Although the policy period extended until October 14, 1986, it provided coverage only for "Wrongful Acts" committed by officers and directors before October 14, 1985.

the event that a claim was later made against directors or officers of the insured.

Klein, one of the appellants, was the President of Merritt and the Chairman of Merritt's Board of Directors at the time Fidelity's D & O policy was issued. He continued as an officer and director until November 26, 1984. Thereafter, he asserted personal control over most of the important aspects of Merritt's operations.

Due to "extreme liquidity pressures" and because depositors had lost confidence in privately insured savings and loans associations in Maryland, Merritt entered into a voluntary conservatorship effective May 13, 1985. The Maryland Deposit Insurance Fund Corporation ("MDIF") was appointed by the court to be Merritt's conservator. The conservator immediately limited withdrawals to $1,000 per account per month. On June 20, 1985, the Circuit Court for Baltimore City eliminated all withdrawals from Merritt to continue until September 20, 1985, or until changed by the court.

## A. THE FOUR NOTICE LETTERS

In regard to the crisis at Merritt, Fidelity received four letters that are important to our narrative. Of the four letters, only the first, the Trice letter, was sent to any of the appellants.

### 1. The Trice Letter

In 1985, Paul Trice was a Senior Vice President of Maryland Savings Share Insurance Corporation ("MSSIC"), the predecessor of MDIF. He wrote a letter to Klein on May 2, 1985, and complained about a number of serious problems his office had found with scores of loans made by Merritt. Mr. Trice complained, for example, that Merritt had lent Delmarva Venture Corporation ("Delmarva") a total of $9,240,710, even though Klein indirectly owned Delmarva through a holding company and was a "controlling person" within the meaning of Maryland Code Annotated, Financial Operations section 9–323(e)(3). That section, in 1985, required that loans to a "controlling person" must be approved by the Division Di-

rector of the Division of Savings and Loan Associations. No such approval was in Mr. Trice's files, and he demanded a complete explanation for the "violation of section 9–323(e)(3) . . . along with a plan for the immediate removal of these loans from Merritt with no loss thereto."

After listing many other violations, or purported violations, of banking laws or regulations by Merritt, Mr. Trice concluded his fifteen-page letter by saying:

In summary, the nature and volume of the items noted above is of paramount concern to this Corporation. Underlying these comments, obviously, are numerous major issues such as the question of independence of Merritt Commercial's board of directors from influence by its stockholder; the apparent lack of adequate internal controls and adequate underwriting in major investments; the concentration of large dollar investments—direct or by loans—in three (3) geographic locations and the timely recovery of these funds without loss to Merritt in the current economy; the ability of Merritt Commercial to complete funding and effect recovery of its major loans and investments in the current environment and marketplace (vis-à-vis Merritt's current and near term liquidity and borrowing posture, savings flows, etc.); the apparent disregard for various statutes and regulations designed to maintain safety and soundness, thereby affording a degree of protection of the saving public's monies and enabling maintenance of integrity and viability in the MSSIC insured industry; etc.

In view of the magnitude of all the above, we are compelled to require that you, the board of directors of Merritt and its senior management officers such as Dennis Finnegan present yourselves in the offices of the Corporation on May 13, 1985 at 10:00 A.M. for the purpose of presenting for our preliminary review, your written responses to each of the matters noted herein. There can not and will not be any further extensions for this meeting or written response to these issues.

## 2.  The Robinson Letter

Zelig Robinson, Esquire, wrote to Fidelity on July 9, 1985, on behalf of the current and former directors and officers of Merritt, including Klein.  His letter concerned "potential claims, which may arise under" Merritt's D & O policy.  Mr. Robinson said:

> This notice, including the Exhibits, describes certain events and transactions in which Merritt and/or its direct and indirect wholly or partially owned subsidiaries ("subsidiaries") engaged, and in which some or all of the insureds were involved, which could possibly result in claims against the insureds on the basis that such events and transactions gave rise to the occurrences referred to above.

> ... it is conceivable that, with the benefit of hindsight, claims may be made by frustrated depositors, creditors, or others against the insureds based upon the following as well as other transactions, events and circumstances, most of which are set forth in the following Exhibits, for the reasons specified, among others.  Accordingly, we believe that under the terms of the above-referenced policy we are obligated to call your attention to any such potential claims.

> \*      \*      \*

> *In view of the occurrences beginning in May 1985, we hereby notify you pursuant to Section 6 of the policy that claims, including those referred to above, may be made against the insureds in respect of one or more of the transactions set forth in the following Exhibits.*  This submission, however, is not and shall not be construed as an admission of any wrongdoing or irregularity; this submission is made solely for the purpose of notifying you, in accordance with the terms of the policy, of the possibility that claims may be made against the insureds.

(Emphasis added.)  Mr. Robinson's letter goes on to summarize, in broad outline form, numerous claims that the writer believed might be brought by others against his client.

### 3. The Thieblot Letter

Robert J. Thieblot, Esquire, special counsel for the conservator for Merritt, wrote a letter that was addressed to Melvin Brown, Director of the MDIF. It was dated September 18, 1985, and a copy was sent to Fidelity on September 20, 1985, by a partner of Mr. Thieblot. The copy was sent pursuant to Paragraph 6 of Fidelity's policy dealing with notice of potential claims. Mr. Thieblot's letter was blunt. He wrote the letter

> to call [Mr. Brown's] attention to various matters which, in our opinion, could give rise to a civil law suit against Gerald S. Klein, and possibly others, relating to gross mismanagement of Merritt and other wrongful conduct. We do not intend at this point to attempt to provide a complete catalogue of transactions, acts, and circumstances which we believe may give rise to liability. Rather, we will provide a broad outline of what we believe to have been Mr. Klein's wrongful conduct, with some specific examples.

Mr. Thieblot continued:

> We believe he may have practiced extensive self-dealing, taken unreasonable fees and dividends, diverted corporate opportunities, exerted undue and in fact total control over the officers and directors of Merritt, forced Merritt to enter highly speculative transactions without Merritt having sufficient (and in some cases any) basis for believing they were sound, and procured unsound appraisals for the purpose of inducing Merritt to enter transactions it should have avoided, and to lend sums in excess of regulatory limits. We also believe that Klein may have committed legal malpractice in connection with his representation of Merritt. We believe that the net effect of Klein's activities was to transform Merritt into an aggressive vehicle which he used to finance his speculative investments, to the detriment of Merritt. We believe Klein's wrongful activities will cost Merritt, and ultimately its depositors or those who have or may undertake to make the depositors whole, millions of dollars.

Mr. Thieblot next proceeded to list numerous: 1) "statutory and regulatory violations" by Klein; 2) examples of "undue influence by Klein"; 3) examples of "self dealing by Klein," including examples of loans by Merritt to entities, which were already on shaky ground, that Klein controlled; and 4) numerous examples of business practices that Mr. Thieblot thought "may be improper." He concluded his letter by stating:

The Maryland statutory and regulatory provisions that may govern cases of this kind are not free from confusion. There are gaps in the law and some inconsistencies. Operative provisions are capable of varying interpretations. Documents and facts have been under the control of Klein and those he directs. Yet I think we now are on notice of facts and circumstances sufficient to permit an informed judgment, and that is that Klein at least, and very possibly others, are liable for Merritt's very substantial losses. If part of the Chase Agreement with Klein (if there is such an agreement) is to be to release him of past liabilities, then that is of course part of the business deal and general settlement with him. If[,] however, that for any reason does not go through, then I advise that suit papers be prepared and filed promptly.

The "Chase agreement with Klein" referred to in the September 18, 1985, letter concerned the purchase of all shares of stock in Merritt by the Chase Bank of Maryland (hereinafter "Chase") and will be discussed in detail *infra.*

### 4. The Frierson Letter

By letter dated October 3, 1985, Robert deV. Frierson, on behalf of the MDIF, gave notice to Fidelity of a potential claim MDIF had against Merritt and its officers and directors. Mr. Frierson said, in pertinent part:

*Pursuant to paragraph 6 of the policy, you are hereby given notice of events, transactions, and circumstances that may give rise to a claim against Merritt that have not already been given to you.*

During the period of your policy's coverage, Merritt may have or may be alleged to have acted or failed to have acted

with respect to various transactions and matters in a manner that may give rise to a claim that Merritt engaged in deceit, fraud, misrepresentation, neglect, self-dealing, breach of fiduciary duties, unjust enrichment, violation of the Maryland and United States securities acts, violation of the Maryland Consumer Protection Act, violation of Merritt's rules, regulations and bylaws, violation of the Maryland Financial Institutions Article, violation of the former MSSIC's rules and regulations, and other violations of state and federal law, the common law, and various rules and regulations. The claims may be asserted against Merritt by depositors and creditors of Merritt, by members of the public (either directly or indirectly through a State agency), by others who have had business dealings with Merritt, by or on behalf of Merritt and its conservator, officers, directors and agents, and by MDIF as successor corporation to MSSIC. The factual basis of potential claims is set forth in greater detail in letters dated September 18, 1985 from Robert J. Thieblot, Esquire to Melville S. Brown and May 2, 1985 from Paul V. Trice, Jr. to Gerald S. Klein, attached hereto and incorporated by reference. Further notification has been previously given by letter and appendix dated July 8, 1985 from Robert J. Thieblot on behalf of MDIF as conservator of Merritt and this notification is incorporated by reference in letter.

(Emphasis added.)

## B.  THE CHASE AGREEMENT

Fearing suits for civil liability due to matters mentioned in the aforementioned letters, Klein, on behalf of Merritt, undertook negotiations with Chase and MDIF for Chase to purchase all Merritt stock. The negotiations were fruitful, and Chase bought Merritt's stock in an agreement that was concluded on October 14, 1985. Chase was paid $25 million by the MDIF for its assumption of control over Merritt, and as part of the bargain, the MDIF agreed to forebear from suing

Klein until Klein paid Chase for various divestments of Merritt property made pursuant to the Chase sale.[4]

Klein, by use of various corporations he controlled, incurred approximately $500,000 in expenses in order to complete the sale of Merritt's stock to Chase. These expenses included fees paid to lawyers, accountants and other professionals for tax returns, tax advice, liquidation of subsidiaries, lobbying, and preparation of financial statements, and tax returns.

### The Policy Exclusions

Fidelity's policy contained the following exclusions:

(a) Except insofar as the [insured] may be required or permitted by law to indemnify the Directors and Officers, the Company [Fidelity] shall not be liable to make payment for Loss in connection with any claim made against the Directors and Officers:

\*  \*  \*

(2) based upon or attributable to their gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled;

\*  \*  \*

(4) brought about or contributed to by the dishonesty of the Directors and Officers. However, notwithstanding the foregoing, the Directors and Officers shall be protected under the terms of this policy as to any claims upon which suit may be brought against them by reason of any alleged dishonesty on the part of the Directors and Officers unless a judgment or other final adjudication thereof adverse to the Directors and Officers shall establish that acts of active and deliberate dishonesty committed by any of the Directors and Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated.

---

4. By 1994, Klein had paid all his indebtedness to Chase under the agreement, except for $10,000.

## Appellants' Claim Against Fidelity

In February 1987, Klein, through counsel, presented a claim to Fidelity under its D & O policy for reimbursement of the monies spent in the negotiations of the sale of Merritt's stock to Chase. Klein's counsel wrote:

[Y]ou will recall that you have had conversations with Mr. Klein and myself relative to the expenditure by Mr. Klein of substantial sums related to the acquisition of Merritt Commercial Savings & Loan Association by Chase Bank of Maryland. A very substantial part of those negotiations involved and culminated in the agreement by the Maryland Deposit Insurance Fund to forebear any civil action against Merritt's Officers and Directors at least until all debts to Chase are paid. In addition to providing potential limitations problems, the structure of that transaction provided very substantial defenses to any claims against Officers and Directors of Merritt which are probably dispositive and would at least facilitate a very favorable settlement. Needless to say, this undertaking by Mr. Klein has resulted in substantial savings to your company far in excess of the amounts expended by Mr. Klein in obtaining these agreements from which you directly benefit[ed].

On March 24, 1987, Fidelity advised Klein's counsel:

Any legal or other professional expenses which may have been incurred by or on behalf of Mr. Klein in connection with the acquisition of Merritt by Chase Bank of Maryland would not have been amounts which Mr. Klein was legally obligated to pay for a claim or claims made against him for a Wrongful Act. Accordingly, these expenses would not constitute Loss under the Policy, and there would be no coverage under the Policy for such expenses.

Approximately six years later, on January 4, 1993, Fidelity again denied Klein's request for coverage for the Chase transactional expenses, stating, "It is the position of Fidelity ... that the Policy does not in any way cover other legal fees and expenses notwithstanding the fact that the expenses incurred may have avoided certain claims." Klein, on January

14, 1993, acknowledged in writing that his claim had been denied, stating:

It is not my purpose to perpetuate this discourse, although I admit it has been stimulating over the years. I was distracted by more pressing matters and had hoped that there would be some kind of reconciliation of our opposing views. That, now, appears to be impossible, and, therefore, I take your letter as a declination of the claim. It is my expectation that I will authorize counsel to enter suit shortly to enforce the claim.

Klein wrote to Fidelity's representative on February 9, 1993, stating:

To be frank, I was disappointed that my last letter did not generate an invitation from you to meet in order to air, once and for all, our disagreements on this subject. Such a meeting would, at a minimum, afford you the opportunity to get specific about what the problem is here, insure that both sides have exhausted the negotiations before suit is filed. In any event, I want you to know that in the absence of communications, I have instructed Jim Ulwick, Esquire of Kramon & Graham to begin drafting our action.

The coverage issue was not resolved, yet appellants never filed the "action" mentioned in the February 9, 1993, letter. On February 22, 1996, more than three years after Klein acknowledged Fidelity's "declination of the claim," Fidelity brought a declaratory judgment action in the Circuit Court for Baltimore City, seeking a declaration that it was under no duty to indemnify either Klein or Middle State's Holding Company, Inc. for "any sums which [they] may have incurred and paid as a result of incurring fees, costs and expenses associated with the sale of Merritt's stock" to Chase.

A bench trial was held on the matter on August 12, 1996, Judge Joseph Kaplan presiding. In a written opinion dated August 15, 1996, Judge Kaplan ruled:

1) No "claim" was made against Klein, as that term is used in the policy, and thus Fidelity had no duty to indemni-

fy either Klein or Middle States for monies expended in the sale of Merritt to Chase;

2) The insured suffered no "loss" as that term is defined under the policy;

3) That even if the insureds had both a "claim" and a "loss" under the D & O policy, any cause of action Klein or Middle States had was barred by the statute of limitations;

4) The defendants were not entitled to recover against Fidelity under the theory of unjust enrichment.

## ISSUES PRESENTED

Appellants raise four issues in this appeal, but we need to address only two, which we have rephrased: [5]

1. Did the letters, received by Fidelity in 1985, threatening possible litigation against Klein and others, constitute a "claim" under Fidelity's Policy?

2. Are the appellants entitled to recovery against Fidelity under an "unjust enrichment" theory?

We answer both these questions in the negative and affirm the judgment entered in favor of Fidelity.

---

**5.** The issues as phrased by appellant are:

I. Do letters from third parties stating causes of action and threatening litigation that would have consumed a "claims-made" Directors and Officers Liability Policy constitute a claim under the policy?

II. In light of this Court's recent decision in *Luppino v. Vigilante Insurance Co.*, holding that limitations does not begin to run until after an insured's obligation to pay becomes fixed upon the entry of a final judgment on the underlying claim, are the claims of the insured under a Directors and Officers Liability Policy barred by the Statute of Limitations where the underlying claims have never been litigated?

III. Where insureds under a Directors and Officers Liability Policy have expended in excess of $500,000.00 to avoid cause of action that were within the coverage afforded by a Directors and Officers Liability Policy, do such expenditures constitute a "loss" requiring reimbursement under the policy?

IV. Is an insurer unjustly enriched where the timely actions of its insureds avoid defense costs and potential liability far in excess of policy limits?

## ISSUE I

■ Fidelity's policy says, in pertinent part:

> If during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the company will pay, in accordance with the terms of the policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay or as to which the Association shall be required or permitted by law to indemnify the Directors and Officers *for a claim or claims made against the Directors and Officers for Wrongful Act(s)* and shall include damages, judgments, settlements and costs, charges and expenses . . . incurred in defense of legal actions, suits, or proceedings and appeals therefrom. . . .

(Emphasis added.)

In Paragraph 6(a), under the heading "Notice of Claim," the policy states:

> If during the policy period . . ., the Association or the Directors and Officers shall: (1) receive written or oral notice from any party that is the intention of such party to hold the Directors and Officers, or any of them, responsible for a specified Wrongful Act . . ., the insured shall during such period give written notice thereof to the Company as soon as practicable and prior to the date of termination of the policy, then *any claim which may subsequently be made* against the Directors and Officers arising out of such Wrongful Act shall, for purposes of this policy, be treated as a claim made during the Policy Year in which such notice was given.

(Emphasis added.)

The word "claim" is not defined in Fidelity's policy. This fact does not, however,

> lead to the conclusion that the term is ambiguous. *See Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864 (9th Cir.1979); *Bensalem Tp. v. Western World Ins. Co.,* 609

F.Supp. 1343, 1348 (E.D.Pa.1985). Ambiguities only exist where reasonably minded people have honest differences. *Eli Lilly [v. Home Insurance Co.]*, 482 N.E.2d [467,] 470 [ (Ind.1985) ]. The term claim is one of the commonest terms in the law. *See St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guaranty Co.*, 2 Haw.App. 595, 637 P.2d 1146 (1981), *quoting* 8 Bac. Abr., where Lord Coke said, "the word demand is the largest word in the law, except claim." The word claim is derived from the Latin word clarmor, "meaning a call or demand. In its ordinary sense the term imports the assertion, demand or challenge of something as of a right. . . ." *San Pedro Properties, Inc. v. Sayre & Toso, Inc.*, 203 Cal.App.2d 750, 21 Cal.Rptr. 844 (1962), *quoting Supera v. Moreland Sales Corp.*, 28 Cal. App.2d 517, 521, 82 P.2d 963 (1938).

*Insurance Corp. of America v. Dillon, Hardamon & Cohen,* 725 F.Supp. 1461, 1468 (N.D.Ind.1988).

All parties agree that the letters from Messrs. Trice, Robinson, Thieblot, and Frierson constituted, at least, notice of a claim within the meaning of Paragraph 6(a). Appellants go a step further, however, and contend that these letters constitute "claims" in and of themselves. According to appellants, because "claims" mentioned in the letters were averted or at least postponed due to expenditures by appellants of more than $500,000, Fidelity was obligated under its policy to reimburse them. Fidelity denied appellants coverage, because according to Fidelity, no "claim" has been made as of the date of trial.

The "first principle of construction of insurance policies in Maryland is to apply the terms of the contract," *Mutual Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130 (1986), to determine the scope and limitations of its coverage. *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995); *Lawyers Title Ins. Corp. v. Knopf*, 109 Md.App. 134, 674 A.2d 65, *cert. denied,* 343 Md. 333, 681 A.2d 69 (1996). This principle serves to achieve the touchstone of policy construction—to ascertain and effectuate the intent of the parties to the agreement.

*Aragona v. St. Paul Fire & Marine Ins. Co.,* 281 Md. 371, 375, 378 A.2d 1346 (1977); *see Schuler v. Erie Ins. Exch.,* 81 Md.App. 499, 568 A.2d 873, *cert. denied,* 319 Md. 304, 572 A.2d 183 (1990). To divine properly the parties' intent, the policy is viewed as a whole, without emphasis being placed on particular provisions. *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 667 A.2d 617 (1995); *Nolt v. United States Fidelity & Guar. Co.,* 329 Md. 52, 617 A.2d 578 (1993); *Simkins Indus., Inc. v. Lexington Ins. Co.,* 42 Md.App. 396, 401 A.2d 181, *cert. denied,* 285 Md. 730 (1979). Moreover, whenever possible, each clause, sentence, or provision shall be given force and effect. *See Pacific Indem. [Co., Inc. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486 (1985)], *supra; Truck Ins. Exch. v. Marks Rentals, Inc.,* 288 Md. 428, 418 A.2d 1187 (1980); *Gottlieb v. American Auto. Ins. Co.,* 177 Md. 32, 7 A.2d 182 (1939).

*Empire Fire and Marine Ins. v. Liberty Mut. Ins. Co.,* 116 Md.App. 143, 165–66, 695 A.2d 624 (1997).

The word "claim" is "one of those words of many-hued meanings [which] derive their scope from the use to which they are put." *MGIC Indem. Corp. v. Home State Sav. Ass'n,* 797 F.2d 285, 288 (6th Cir.1986) (quoting *Powell v. U.S. Cartridge Co.,* 339 U.S. 497, 529, 70 S.Ct. 755, 772, 94 L.Ed. 1017 (1950) (Frankfurter, J., dissenting)). In its broadest sense, the term can sometimes mean "contention"; but as appellants point out, in construing contracts, courts give words their ordinarily accepted meaning when contract terms are undefined. "The ordinary meaning of 'claim made' refers to the assertion of a claim by or on behalf of the injured person against the insured." *St. Paul Fire & Marine Ins. Co. v. House,* 315 Md. 328, 332, 554 A.2d 404 (1989).[6]

---

**6.** The issue presented in *House* was different from the issue in the case *sub judice.* In *House,* the opinion provides little guidance in this case because in *House,* using the "ordinary meaning" of the term "claims made," a claim was unquestionably made against the insured physician within the policy period. In *House,* a former patient of the insured had filed a claim against the insured with the Health Claims Arbitration Office during the policy period. What made the policy ambiguous in

Using the ordinary meaning of the term, Robinson's letter cannot be construed as making a "claim." Robinson represented the appellants, and he, of course, made no claim against his own clients. Instead, Robinson simply alerted Fidelity, pursuant to Paragraph 6, of "potential claims, which may arise under" the D & O policy.

As will be recalled, Thieblot's letter was to Melvin Brown, Director of the MDIF. In the letter, Thieblot made no demand against anyone. He simply recommended that MDIF sue Klein, and possibly other directors, unless the "Chase agreement" prohibited such a suit.

Fierson's letter, which enclosed copies of both the Thieblot and Trice letters, notified Fidelity of potential claims pursuant to Paragraph 6 of the D & O policy. No demand was made of either Fidelity or appellants. As previously explained, the Trice letter that Fierson enclosed expressed serious concerns about Klein's actions and made numerous inquiries. The letter did not, however, demand money from appellants nor demand that appellants do anything except, in the case of certain officers, appear at a meeting to be held on May 13, 1985, and present "written responses" to the allegations set forth in the letter. Significantly, the appellants do not contend in their brief that the Trice letter constituted a "claim" within the meaning of the policy.

Appellants do contend, however, that the Robinson, Thieblot, and Fierson letters constituted "actual claims." They argue:

> In the context of insurance, Webster's defines a "claim" as "a demand for something due or believed to be due ..." Webster's Seventh New Collegiate Dictionary 203 (G. & C. Merriam Co.1981). Black's supplies a more technical legal definition of "claim": "[t]o demand as one's own or as one's right; to assert; to urge; to insist. *Cause of action.*" *Black's Law Dictionary* 224 (5th ed.1979) (emphasis sup-

---

*House* is that it had two conflicting provisions as to when a claim was made.

plied). "Cause of action" is defined as "[t]he fact or facts which give a person a right to judicial relief . . . [a] situation or state of facts which would entitle party to sustain action and give him right to seek a judicial remedy in his behalf." *Id.* at 201. *See also, Polychron v. Crum & Forster Insurance Companies,* 916 F.2d 461, 463 (8th Cir.1990). A lawsuit, as opposed to a claim, is a "suit, action or *cause instituted or [pending] . . . in a court of law.*" Black's at 799 (emphasis supplied). Therefore, according to the definitions of the relevant terms contained in Black's, it is clear that "claim" includes the assertion of the relevant facts and legal theories that give rise to potential liability, whether or not the claim is formally filed in court. As the *Polychron* court noted, Black's does not normally supply the ordinary and accepted meaning of words. 916 F.2d at 463. However, in light of the definition in Webster's and the definitions in Black's, the Robinson, Thieblot and Frierson letters are clearly claims.

Using the *Webster's* definition, which is quite similar to the "ordinary meaning" set forth by the Court of Appeals in *House, supra,* the three letters here at issue do not make "claims" because the letter writers fail to make "a demand for something due or believed to be due." Moreover, using the *Black's* definition of a claim, the three letter writers did not "demand [anything] as one's own or as one's right." Taken as a whole, the letters, at most, simply warn that claims were likely to be filed against Klein and other officers and directors.

Appellants' argument that letters warning of an intent to take legal action constituted a "claim" against Klein (and others) is refuted by reading the policy as a whole. Paragraph 6(a) is a "claims after termination clause." Typically, such a clause

> provides that if an insured becomes aware and gives notice to an insurer during the policy period of the occurrence of a specific wrongful act or if circumstances that could give rise to a claim, a claim subsequently made arising out of such wrongful act or circumstances will be deemed made "during the [p]olicy period."

*In re Ambassador Group, Inc. Litigation,* 830 F.Supp. 147, 157 (E.D.N.Y.1993) (quoting Harley, *Recent Decision of Interest, in Directors' and Officers' Liability Insurance,* 333, 363–65 (Practicing Law Institute, 1990)). Paragraph 6(a) in Fidelity's policy plainly distinguishes between notice to the insurer that it is the intention of a party to hold an officer or director responsible for wrongful acts and "claims which may subsequently be made against the Directors and Officers" for wrongful acts. Under Paragraph 6(a), *if* there is a notice of a potential claim given to the insurer within the policy period and *if* there later is a claim filed, the notice of potential claim shall be treated as a "claim made" during the policy. If a "claim" and a notice of the intention to make a claim were the same, then the claims after termination provision (Paragraph 6(a)) would be superfluous. As Judge Kaplan pointed out in his written opinion, under Fidelity's D & O policy, a "claim" is not made merely by the insurer's receipt of notice that a party intends to hold a director or officer liable for a wrongful act. Several cases from other jurisdictions have reached a conclusion similar to that reached by Judge Kaplan.

In *MGIC Indem. Corp., supra,* a D & O policy was issued. As in the case *sub judice,* the insurer agreed that, "if during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for Wrongful Acts, the Insurer will pay in accordance with the terms of the policy, on behalf of the [Home State Savings] Association, all loss for which the Association is required to indemnify or for which the Association has, to the extent permitted by law, indemnified the Directors and Officers." 797 F.2d at 286. The definition of "loss" set forth in the MGIC Indemnity Corporation policy was virtually identical to the definition set forth in the policy issued by Fidelity.[7]

---

7. The Fidelity's D & O policy defined "Loss" as meaning:
   (d) ... any amount which the Directors and Officers are legally obligated to pay or as to which the Association shall be required or permitted by law to indemnify the Directors and Officers for a claim or claims made against the Directors and Officers for Wrongful Act(s) and shall include damages, judgments, settlements and costs, charges

During the policy period, the Home State Savings Association ("Home State") received loan commitment fees of more than $795,000. Some of the commercial customers who paid these fees, as well as a federal prosecutor, subsequently contended that the loan commitments received by the customers were illusory. *Id.* at 287.

An Assistant U.S. Attorney advised Home State that five of its officers were considered to be targets of a grand jury investigation then being conducted of Home State's activities. *Id.* Later a two-count information was filed against Home State charging it with having obtained loan commitments through fraudulent representations. *Id.* A plea bargain was proposed to Home State whereby it would repay $795,000 to its customers and plead *nolle contendre* to the charges. In exchange, the prosecutor agreed to forego seeking or pursuing criminal charges against any of Home State's individual officers. One of the main considerations that led Home State to accept the plea agreement was the agreement not to prosecute the officers individually. *Id.*

When Home State sued its insurer to recover $795,500 under its D & O "claims made" policy, the trial judge granted summary judgment in favor of the insurer. On appeal, one of the principal issues was whether Home State paid the $795,-000 for "claims made against the Officers and Directors for Wrongful Acts." *Id.* at 287. The *MGIC* Court noted that of critical importance was the fact that the insurer agreed to indemnify Home State only "if, during the policy period, any claim or claims are made against the Directors and Officers for a Wrongful Act." *Id.* at 288. This exact provision is contained in the policy issued by Fidelity, and as aptly pointed out in *MGIC:*

> and expenses (excluding salaries of Officers or Employees of the Association) incurred in the defense of legal actions, suits or proceedings and appeals therefrom, and cost of attachment or similar bonds; provided, however, such Loss shall not include fines or penalties imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

*The existence of claims "of" wrongful acts does not of itself mean that claims were made against the officials "for" the wrongful acts.* Home State failed to show that any such claim was made against any director or officer during the policy period, and we think it was incumbent on Home State to make such a showing, or to show a bona fide dispute as to whether such a claim had been made, if MGIC's summary judgment motion were to be defeated.

... Although "claim" often means "contention," that is not the use to which it has been put in the insuring agreement. If claims were made in the newspapers that directors and officers of Home State engaged in wrongful acts, those would obviously not be the kind of "claims" that could make MGIC liable under the insuring agreement. The agreement, as we read it, is speaking *not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing.* In context, it seems to us, the only kind of "claim or claims" that could trigger the insurer's obligation to pay would be a demand for payment of some amount of money. Thus it is that the policy defines "loss" in terms of an "amount"—i.e., an amount of money—which amount the officials are legally obligated to pay or for which amount they have been indemnified or are required to be indemnified.

Home State suggests that there was a *potential* for demands against the officials for the payment of money, but a mere potential for such claims is not enough to meet the condition imposed by the policy. The agreement was that MGIC would pay if, during the policy period, "claims *are* made against the Directors and Officers." (Emphasis supplied.) That condition is not satisfied, in our view, where claims might have been made during the policy period, but were not.

*Id.* at 288 (emphasis added).

The case of *In re Ambassador Group, Inc. Litigation, supra,* was one of the cases relied upon by Judge Kaplan when he concluded that no claim had been made against appellants.

The case involved a D & O policy issued by the National Union Fire Insurance Company ("National Union") to the Ambassador Group. The insuring clause in National Union's policy is identical (in all material respects) to that set forth in the policy issued by Fidelity. It provided that the insurer would pay "on behalf of" the directors and officers of the insured and its subsidiaries "loss . . . arising from any claim or claims which are first made against the [directors or officers] during the policy period by any Wrongful Act." The National Union policy had a Paragraph 7(c), which was a "claims after terminations" clause similar to Paragraph 6(a) in Fidelity's policy. National Union's policy did not define the term "claim." At issue was whether letters to National Union from the Vermont Commission of Banking and Insurance, as receiver for the Ambassador Group, constituted a "claim" under the policy. One letter advised the insurer that the "Commissioner [h]ad uncovered facts which [led] him to conclude that certain former directors and officers were guilty of acts falling within the scope of coverage afforded by the . . . policy, resulting in losses to the estate of the Ambassador [Group]." *In re Ambassador Group*, 830 F.Supp. at 151. What the Court said in the *Ambassador Group* opinion is here apposite:

> The specific language of the notice provisions of the policy support this distinction between the making of a claim and the reporting of a claim made or a potential or inchoate claim. Section 7(b) provides that either the company or its directors and officers must, as a condition precedent to the directors' and officers' right to be indemnified, give notice as soon as practicable of any claims made upon the directors and officers. Section 7(c) provides that if National Union is given written notice of an inchoate claim, the claim subsequently made will be deemed a claim made during the policy period. *Thus, the reporting of a claim or an inchoate claim by the company or the directors and officers must necessarily be something other than the making of the claim.*

*Id.* at 154 (emphasis added).

Later the court said:

The policy distinguishes between claims made upon the Directors and Officers, notice to the Directors and Officers of the third party's intention to hold them responsible for the results of a specific Wrongful Act and the Directors and Officers' awareness of an occurrence which may subsequently give rise to a claim against them. Thus, the policy itself (referring to the Notice of Claim provision) confirms that neither notice to the Directors and Officers of a third party's intention to make a claim nor awareness on the part of the Directors and Officers of an occurrence that may subsequently give rise to a claim is the equivalent of a claim having been made. There is something different from and antecedent to a claim.

*Id.* at 155.

*Evanston Insurance Co. v. Security Assurance Co.,* 715 F.Supp. 1405 (N.D.Ill.1989) is another case involving a D & O policy with terms similar to those in the policy issued by Fidelity. The Court in *Evanston Insurance Co.* pointed out that, although the policy did not define "claim," the term "held no mystery." The Court went on to say:

Clearly the Policy uses the term "in its common (and common sense) usage: *an effort by a third party to recover money from the insured* " (*id.* [*National Union Fire Ins. Co. v. Continental Ill. Corp.,* 673 F.Supp. 300] at 307 n. 17 [(N.D.Ill.1987]). That usage conforms to the garden-variety dictionary definition of "claim" (*Black's Law Dictionary* 224 (5th ed.1979):

Demand for money or property, e.g. insurance claim.

\*     \*     \*

What *is* relevant here is that clearly none of the three September 1982 communications *qualifies as a "demand for money or property."* After all, American Benefits had not been damaged in any way on September 23–24. What Security [the insured] was being told, in no uncertain terms, was that it would be held liable for any possible *future* damages flowing from its refusal to honor its commitment. But such a warning (or even threat) of a possible future suit,

at least framed in the way the communications went to Security, does not qualify as a present "claim."

715 F.Supp. at 1412–13 (emphasis added) (footnote omitted).

In *Hill v. Physicians & Surgeons Exchange of California*, 225 Cal.App.3d 1, 274 Cal.Rptr. 702 (1990), a coverage issue arose when Dr. Michael Steinway performed shoulder surgery on Roberta Hill. *Id.* 274 Cal.Rptr. at 703. Following the surgery, Hill was unable to move her right wrist and was without sensation in her right arm. *Id.* When Hill asked Dr. Steinway, immediately after the operation, "if this was supposed to happen," Dr. Steinway said, "No." *Id.* Hill immediately told Dr. Steinway that she was dissatisfied with his work and, one month after the operation, discontinued her use of his services. *Id.* At issue in the *Hill* case was whether Ms. Hill had made a "claim" against Dr. Steinway within the policy period of Steinway's "claims made" policy. The *Hill* Court commented:

> "A claim, both in its ordinary meaning, and in the interpretation given to it by other courts in similar circumstances [citation], is a demand for something as a right, or as due." (*Phoenix Ins. Co. v. Sukut Construction Co.* (1982) 136 Cal.App.3d 673, 677, 186 Cal. Rptr. 513). *A claim requires more than an inquiry requesting an explanation* (*Hoyt v. St. Paul Fire and Marine Ins. Co.* (9th Cir.1979) 607 F.2d 864, 866–867) or the lodging of a grievance without a demand for compensation (see *American Mutual Liability Insurance Co. v. Goff* (9th Cir.1960) 281 F.2d 689, 692), but less than the institution of a formal lawsuit (*Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.* (1976) 64 Cal.App.3d 261, 270, 134 Cal.Rptr. 427). The word claim imports "the assertion of a liability to the party making it to do some service or pay a sum of money...." (*Id.* at p. 269, 134 Cal.Rptr. 427, quoting *San Pedro Properties, Inc. v. Sayre & Toso, Inc.* (1962) 203 Cal.App.2d 750, 755, 21 Cal. Rptr. 844.)

In rejecting Hill's claim, the Court said:

[W]hether Hill believed or Steinway knew he had fallen below the standard of care is irrelevant to the issue of whether Hill made a claim against him. At no time during the policy period *did Hill demand Steinway perform a service owed her or compensate her in any way.* Although Hill asserts she was worried, frightened and terribly upset with the results of the surgery, she remained Steinway's patient for one month following surgery. During this time, Hill did not demand money or any specific remedy. *At most, she requested an explanation and expressed her disappointment.* Contrary to Hill's position, a *complaint is not an assertion of a right.* Moreover, the fact [that] Steinway may have been aware of Hill's injury is not sufficient to constitute a claim because *"[a] claim connotes an assertion of a legal right, as distinguished from a recognition of that right." (Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co., supra,* 64 Cal.App.3d at 269, 134 Cal.Rptr. 427; see also *Ins. Corp. of Amer. v. Dillon, Hardamon & Cohen,* (N.D.Ind.1988) 725 F.Supp. 1461, 1470.) Thus, no claim was made against Steinway during the applicable policy period.

*Id.* at 704–05 (emphasis added).

In support of its contention that a threat to file suit of the type set forth in the Thieblot letter constitutes "claims" within the meaning of the policy, appellant cites *Berry v. St. Paul Fire & Marine Ins. Co.,* 70 F.3d 981 (8th Cir.1995) and *Polychron v. Crum & Forster Ins. Cos.,* 916 F.2d 461 (8th Cir.1990).

In *Berry,* unlike the present case, the insurance policy defined the word "claim." It was defined as meaning a "demand in which damages are alleged." As issue was whether a letter from an insured party's lawyer, dated July 1, 1988, constituted a "claim" within the meaning of the policy. *Id.* at 982. The *Berry* Court discussed the attorney's letter by observing:

We think this letter, fairly read, clearly qualified as a "claim." In the first place, the letter itself refers to the

"Products Liability Claim of Ronald D. Berry." It states that Berry's sustained personal injuries and disability are the result of the use of an Empire product, and that the letter should be forwarded to Empire's insurance company so that "the situation" can be discussed before suit is filed. The letter does not state damages of a particular amount, but it does say that "Mr. Berry has sustained severe and permanent disability," and the inference that Mr. Berry's injuries and disability should be compensated in money is unmistakable. The letter is telling Empire that Mr. Berry has a claim, that the claim is Empire's responsibility, and that the claim should be referred to Empire's insurance company. Further, the reference to an attorney's lien presupposes the existence of a claim, because it is a claim to which the lien attached under state law.

It is argued, in opposition to this conclusion, that the letter was not a claim or demand, but merely a communication of a present legal right. *On this view, no claim would occur until Mr. Berry affirmatively brought suit or made a specific demand for payment.* We think the argument is strained. True, the letter does not request payment of a specific dollar amount, but sometimes complaints in actions actually filed in Court don't either, so this omission does not seem inconsistent with the letter's being treated as a "claim." Treating the letter as other than a claim, it seems to us, requires a tortured construction of its text. In our view, anyone receiving this letter would know that Mr. Berry was claiming that he was owed money.

*Id.* at 982.

*Berry* is distinguishable from the case at hand in three ways. The Fidelity policy does not contain the definition set forth in the policy issued by the insurer in *Berry;* as far as is shown by the opinion, the *Berry* policy had no language similar to that set forth in Paragraph 6(a) of the Fidelity policy; and the letters here at issue do not, either explicitly or implicitly, demand money of appellants. To reiterate, both the Robinson and Fierson letters, by their terms, are letters sent pursuant to Paragraph 6(a) alerting the insurer of poten-

tial claims. The Thieblot letter is in no way similar to the letter sent in *Berry*. The Thiebolt letter was neither addressed to the insured nor does it make any demand whatsoever. Although the Thieblot letter was forwarded to the insurer, it was sent by Thieblot's partner, not as a claim but to notify Fidelity of a potential claim, pursuant to Paragraph 6(a) of the policy.

At issue in *Polychron, supra,* was whether a "claim" was made against a bank president within the meaning of a "claims made" policy. 916 F.2d at 463. The language in the bank's D & O policy appears to be basically similar to that in Fidelity's policy. Mr. Polychron, as bank president, was the "target" of a grand jury investigation. *Id.* The grand jury, prior to the indictment of Mr. Polychron, subpoenaed bank records concerning the president's actions. Immediately after the bank's records were subpoenaed, Mr. Polychron hired an attorney who performed services for Mr. Polychron prior to the latter's indictment. *Id.* Mr. Polychron sought reimbursement from the insurer for fees paid to the attorney under the policy. *Id.* The *Polychron* Court interpreted the term "claim" using a portion of the definition set forth in *Black's Law Dictionary, i.e.,* "to demand as one's own or as one's right, to assert; to urge; to insist." *Id.* The Court held that the term "claim" was broad enough to encompass "the first grand jury investigation of Mr. Polychron" and therefore the bank was entitled to recoup his attorney's fees. The Court said:

> The function of a subpoena is to command a party to produce certain documents and therefore constitutes a "claim" against a party. The subpoena, it is true, was directed to the bank, but the documents demanded (not merely requested, as defendants would have it) related to the plaintiff's conduct as a bank official. Further, the grand jury's investigation and the questioning by the Assistant United States Attorney amounted, as a practical matter, to an allegation of wrongdoing against Mr. Polychron, for which he prudently hired an attorney. The defendants' characterization of the grand-jury investigation as mere

requests for information and an explanation underestimates the seriousness of such a probe.

*Id.*

We have no quarrel with the result reached in *Polychron,* because using the "ordinary meaning" of the term "claim" that was set forth by the Maryland Court of Appeals in *House, supra,* the same result as in *Polychron* might well have been appropriately reached by a Maryland court. But unlike the grand jury subpoenas issued in *Polychron,* the three letters here at issue did not demand something of right.

In their reply brief, appellants say:

At trial, [Fidelity's] corporate designee testified that "claims" means "Legal action, suits or proceedings." Similarly, the policy defines "Loss" to include amounts incurred in the defense of "legal actions, suits or proceedings...." Accordingly, F & D admits that "proceedings" are claims, and that expenses incurred in defense of proceedings constitute Loss under the Policy. As [Fidelity's] corporate designee testified at trial, "proceedings" is not defined in the policy.

Klein and Middle States have previously noted that a Maryland statute supplied a definition for "proceedings" in the context of officers' and directors' liability for alleged wrongful acts or omissions:

"Proceeding" means any *threatened,* pending or completed action, suit or proceeding, whether *civil, criminal, administrative, or investigative.*

Md.Code Ann., Corps. & Ass'ns § 2–418(a)(6) (emphasis supplied).

The Robinson, Frierson and Thieblot correspondence, at a minimum, "threatened" civil litigation against Klein and the other directors of Merritt.

\*　　\*　　\*

The record also shows that the Attorney General, Merritt's conservator, and the MSSIC all conducted detailed investigations into the activities of Merritt's directors. It is

therefore clear that the State instituted proceedings, as defined by the statute, against Klein through its investigation and through all-but-certain litigation.

(Reference to record extract omitted.)

Later in the reply brief, appellants argued:

Under this definition [of the word "proceeding" as defined in the Md.Code Ann., Corps.  & Ass'ns], it is clear that the State instituted proceedings against the directors and officers of Merritt.  Because [Fidelity] admits that "proceedings" are "claims," and that costs incurred in defense of such claims constitute "loss" under the policy, [Fidelity] owes an indemnity obligation to Klein and to Middle States.

If we assume, *arguendo*, that the investigations by the Attorney General, Merritt's conservator, and the MSSIC were all "proceedings" within the meaning of the policy, appellants would still not prevail.  Under the policy's definition of "loss," an insured may recover only expenses "incurred in the defense of proceedings."  Appellants did not prove that they expended one penny in defense of any of the investigations mentioned in the reply brief.  They proved, instead, that they spent money in selling stock to Chase.

We conclude for the above reasons that Judge Kaplan correctly ruled that no "claim" was made against appellants.[8]

## ISSUE II

### UNJUST ENRICHMENT

█ Testimony showed that Fidelity's policy limits were three million dollars but approximately one-half of that amount had already been paid out prior to suit.  Under the

---

8.  In ruling that "no claim" has thus far been made against appellants, Judge Kaplan gave one additional reason, with which we also agree. He wrote:

Furthermore, because the mere threat of an action gives F & D no way of determining if it is based upon acts which were excluded from coverage under the policy, it would be unreasonable to find that its obligation to indemnify became operative solely upon receipt of a letter threatening suit. . . .

Chase agreement, MDIF, a state agency, can still sue appellants, and such a claim would not be barred by limitations. Fidelity admitted at trial that, if covered claims were made against appellants by MDIF, defense costs would exceed the remaining policy limits. Thus, one of the benefits Fidelity obtained as a result of the Chase agreement was that it has had the use of one and one-half million dollars for over ten years, which it would not have had if MDIF had brought a claim covered by the D & O policy. Moreover, due to the age of the potential claim, there is a possibility that MDIF will never bring suit against Fidelity's insured, which is another indirect benefit that Fidelity may have received as a result of the Chase Agreement.

While it is clear that Fidelity probably did benefit from the Chase agreement, it is just as clear that appellants were not motivated to enter into the Chase agreement to benefit Fidelity. Rather, the prime motivation was that of self-interest, *i.e.,* to prevent both criminal and civil actions against Klein and other officers.

The elements of a claim of unjust enrichment are:

1. a benefit conferred upon the defendant by the plaintiff;
2. an appreciation or knowledge by the defendant of the benefit;
3. the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of it value.

*Yost v. Early,* 87 Md.App. 364, 386–87, 589 A.2d 1291, *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991).

Appellants argue that Fidelity is liable to them for the monies expended in regard to the Chase transaction as a "quasi-contractual remedy" under an unjust enrichment theory. As admitted by appellants, no Maryland appellate court has thus far decided whether an insured is entitled to restitution for preventive measures taken that benefit the insurer. In *W.M. Schlosser Co. v. Insurance Co. of N. Am.,* 325 Md. 301, 310, 600 A.2d 836 (1992), the Court noted:

The question is interesting, and determination of whether to grant restitution for preventative measures requires careful consideration of a number of factors. See the comprehensive discussion of a number of relevant factors by Judge Barry in *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525 (D.N.J.1986), *aff'd* 831 F.2d 287 (3d Cir.1987), involving an unsuccessful attempt by the manufacturer of "Tylenol" to recover from its liability insurance carrier $100,000,000 expended for the recall of the product following the death of seven persons who had ingested Tylenol capsules laced with cyanide.

■ Language used by Judge Barry in the *McNeilab* case is instructive here. As he pointed out, "[c]ertain commentators have suggested ... that based on a theory akin to unjust enrichment, recovery for [monies expended to prevent damages] ... might be had outside the explicit provisions of the policy, assuming, of course, that there be coverage for the potential damages averted." 645 F.Supp. at 547. When a plaintiff attempts to recover against an insurer under an unjust enrichment theory, then principles of restitution apply. *Id.*

The *McNeilab* Court said:

It is, indeed, a narrow line that must be walked in order to recover under a restitutionary theory. *The actor must be motivated in part by an interest in reward, or his actions will be altruistic, gratuitous, and uncompensible.* Plaintiff's recall was not at all motivated by *an interest in a reward from its insurers.* On the other hand, in most cases there can be no recovery if the actor's deeds are undertaken in self-interest (as opposed to interest in a reward recovery) for the actor has suffered no loss, i.e., he would have done the same thing even had the beneficiary possessed no interest in the object of the actor's efforts. This self-interest is evident here.

*[The] Allocation of Costs [Theory] argues that an insured cannot be an officious intermeddler in the business of the insurer when he acts to mitigate damages to himself.* This

contention, too, can be disputed on two grounds. First, according to a noted expert in the field of restitution, courts have consistently denied attempts of all persons but lawyers who, simultaneously serving their own interests, seek to recover on a restitutionary theory from another whose interest was also served by their endeavors. Dawson, The Self–Serving Intermeddler, 87 Har.L.Rev. 1409, 144–50, 1457–58 (1974). See Restatement of Restitution 2d, Tentative Draft No. 1, § 21 Comment c (April 5, 1983). This conclusion is in line with the civil law precept denying recovery on negotiorum gestio when the benefactor's acts also benefit himself. Second, at least one recent case has held that an insured was an intermeddler vis-a-vis the insurer when he acted to mitigate damages for which the insurer might ultimately have been liable. See *J.L. Simmons Co. v. Lumbermens Mut. Ins. Co.*, [84 Ill.App.2d 98], 228 N.E.2d 227.

*Id.* at 549 (emphasis added).

We agree with the *McNeilab* analysis. The sale of stock to Chase greatly benefitted appellants, as did the recall measures undertaken by the manufacturers of "Tylenol," which were discussed in *McNeilab*. Appellants negotiated the sale of the stock to Chase without ever telling Fidelity beforehand that they intended to seek reimbursement under the policy for sale expenses. Appellants' deeds and actions, like those of the plaintiff in *McNeilab*, were unquestionably motivated by self-interest as opposed to an interest in obtaining a reward from the insurer. Appellants are not entitled to restitution of the monies expended under an unjust enrichment theory because the "circumstances are not such as to make it inequitable for [the insurer] to retain the benefit without payment of the value." [9]

---

9. Additionally, appellants failed to prove that the monies were paid or expenses undertaken "in an emergency situation" a *sine qua non* for the application of restitution doctrine in cases such as this. If they had wished to do so, there was plenty of time, prior to the Chase Agreement, to tell Fidelity what monies they were spending and why. Appellants waited for more than one year after the agreement had been

For all the above reasons, we affirm.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

signed to tell Fidelity what they had spent and that they claimed Fidelity had an (alleged) duty to reimburse those monies. *See McNeil-ab, supra,* 645 F.Supp. at 548.